IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JEFFERSON D. WALKER, | ) | No. C 06-5050 JSW (PR) |
| Petitioner, | ) | |
| | ) | **ORDER DENYING PETITION FOR A** |
| vs. | ) | **WRIT OF HABEAS CORPUS** |
| | ) | |
| B. CURRY, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**INTRODUCTION**

Petitioner Jefferson Walker, a prisoner of the State of California currently incarcerated at the Correctional Training Facility in Soledad, California, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Parole Hearings' ("BPH") denial of parole during parole suitability proceedings in 2005. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof. Petitioner has filed a traverse. For the reasons stated below, the petition is denied on the merits.

**BACKGROUND**

On May 4, 1982, in Alameda County Superior Court, Petitioner was convicted by a jury of first degree murder and was found to have inflicted great bodily injury on the victim. (Respondent's Answer Exhibit (hereinafter "Answer Ex.") 1.) Petitioner was also found guilty of soliciting murder for hire. (Answer Ex. 5.) On June 30, 1982, the trial court sentenced him to a term of twenty-five years to life in state prison for first

degree murder and four years for soliciting murder for hire, to be served concurrently. (Answer Ex. 1 & 5.)  Petitioner's minimum parole eligibility date was June 4, 1996. (Answer Ex. 2, Petition Exhibit (hereinafter "Pet. Ex.) 2 at 1.)  In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole by BPH during a subsequent parole suitability hearing on September 8, 2005.

BPH relied, in part, upon the following account of Petitioner's commitment offense excerpted from the August 12, 1983 California Court of Appeal opinion concerning the direct appeal of his conviction:

> In the early morning hours of June 7, 1981, Officers Seymore, . . . Scott, . . . and Weakland . . . of the Livermore Police Department received a dispatch call to go to 341 Helen Way in Livermore.  When they arrived appellant Jeff Walker met them at the front door and directed them into the master bedroom where his wife was injured and needed medical attention. The officers went to the master bedroom and they found [Petitioner's] wife, Suzie Walker, lying in the bed with massive head injuries.  Suzie Walker was taken to the hospital by ambulance, underwent surgery and was placed in the Critical Care Unit in a coma.  She remained unconscious for eight days and died on June 15, 1981.
>
> After continuous investigation by [the] Livermore Police Department, Walker was arrested for the murder of his wife in August 1981.  While he was being held at Santa Rita [Jail] between August 25th and 26th, he had conversations with his cellmate Mr. Charles Bell.  According to Mr. Bell's testimony at the preliminary hearing, Walker solicited Mr. Bell to murder a potential witness against Mr. Walker, a Mr. Tommy Olsen . . . .  Walker [was] released from Santa Rita.
>
> After Walker was released from Santa Rita without being charged, he returned to the jail to visit Mr. Bell.  According to Mr. Bell, they discussed the agreement for Bell to murder witness Olsen.  Two days after the visit, Walker once again visited Bell at Santa Rita and, again, briefly discussed the deal.  However, prior to his visit Bell contacted [p]olice authorities and inform[ed] them about Mr. Walker's solicitation of him for murder.  It was then arranged that Bell would telephone Walker at his home and the conversation would be tape-recorded with the consent of Bell and unknown to Walker.  The content of that tape recording, and Bell's testimony in the preliminary hearing, was the sole evidence against Walker regarding the charge against Walker that he solicited Bell to commit the crime of murder.
>
> At trial, the prosecution put on numerous witnesses, including Tommy Lee Olsen, a close friend of Walker[].  Olsen testified on numerous occasions, that during the weeks proceeding the attack on the victim, Walker

discussed with him plans and a desire to do away with his wife.  Olsen further testified that he went to Walker's house on the evening of the attack, helped Walker make the residence look like the scene of a burglary by carrying away valuable property and leaving a bag of [methamphetamine] on the floor and then he hit, or struck, Walker several times in the head.

Walker testified at trial on his own behalf.  He told the jury that he had met, and married, Suzie Walker at a fairly early age and in fact had not had sexual relations with any other women prior to his marriage.  A great bulk of his testimony related to his relationship with his wife, in which it was indicated that he was compelled to give up dancing hobbies due to the wishes of his wife.  She controlled everything and was obsessed by her appearance and perfectionism.  He eventually reached the conclusion that all the options to end the relationship were unworkable and that it was either suicide or murder.  He admitted administering a severe beating of his wife with a heavy, lead fishing weight and testified to a state of mind as being of intense anger at the time of the commission of the crime.  The gist of Walker's testimony, as well as that of other defense witnesses - eight defense witnesses and two prosecution witnesses - was to the effect that Walker was an emotionally battered husband and that his mind formulated the thought that his only option was to end the repressive situation he found himself in, was murder.

(Answer Ex. 2, Pet. Ex. 2 at 15-18.); *see People v. Walker*, 145 Cal. App. 3d 886 (1983).

BPH also read into the record Petitioner's statement claiming "I accept complete and full responsibility for this horrible and brutal death of my wife" and describing the circumstances of the crime as follows:

With a one and a half pound weight, [I] struck Suzie about the head and neck ten or twelve times but she did not succumb to the blows.  Not wanting her to be in pain, I threw the weight down and hit her with my hand at the back of her neck to render [her] unconscious.  At that moment I came to my senses and went to call for help.  I was also very scared.  I started to call Tommy Olsen, [and he] pulled up in front of the office.  Out of fear and self-preservation, I went through with the cover-up and then called for help.  As evidence presented at this trial, at no time was I knocked unconscious and I knew full well that Suzie was alive and I only wanted her to live.  I realized that my actions affected, not only our boys and Suzie's family, but the community at large, and my actions are still affecting the community today by the actions of my youngest son Aaron; whose life was impacted in ways I never imagined.  Words can not begin to express the depths of my remorse.  I took a beautiful and vibrant life and robbed our two young boys of their mom and their innocence and I took a member of the family away that is missed at every occasion.

As to the solicitation, although I did not, at any time ask Charles Bell to kill Tommy Olsen, I did ask Bell to talk to Olsen and persuade him from saying anything.  It was Bell who spoke of killing Olsen.  I did not stop

3

him in that conversation, therefore I am guilty. Guilty by omission for not doing the right thing when I knew better. I'm just as guilty as though I did ask Bell to kill Olsen. I accept complete and full responsibility for the murder of my wife and the solicitation to kill Tommy Olsen. I harbor no animosity or hard feelings for Tommy Olsen for testifying against me. Olsen did not get me involved in this, I got him involved, and in my mind he did the right thing by testifying against me.

Neither do I harbor any animosity towards Charles Bell, as it was brought up in the preliminary hearing, Bell is a paranoid schizophrenic and in the mind of a person suffering such mental illness, he probably really interpreted my request to talk to Olsen to mean 'kill Olsen.' I am deeply remorseful for what I did and all those who were affected by my actions of murdering Suzie and the solicitation.

(Answer Ex. 2, Pet. Ex. 2 at 18-21.)

BPH considered Petitioner's parole plans and noted that his primary plan was to move to Texas and go into business with his son Brian fixing cars and restoring homes. (Answer Ex. 2, Pet. Ex. 2 at 21-24.) BPH also noted that Petitioner had an alternate plan to work for a family friend at a law enforcement dog training academy, as well as another alternate plan to live at a residential program for parolees in Alameda County. (*Id.* at 24-25.) Petitioner also detailed many resources that would be available to him upon parole, prompting the BPH Commissioner to remark that Petitioner had "certainly done [his] homework." (*Id.* at 25-30.)

In discussing Petitioner's personal history, the Board considered Petitioner's unhappy marriage where his wife "controlled everything in his life," his military service, his steady work history, and his participation in volunteer activities in the church and community. (Answer Ex. 2, Pet. Ex. 2 at 31-33.) The BPH also considered letters of support from Petitioner's mother, his two sons, a friend in the Prison Ministry, and a friend who also offered him employment. (*Id.* at 33-36.)

The Presiding Commissioner also read into the record a letter from Alameda County Deputy District Attorney Martin Brown, who had prosecuted Petitioner for the murder of his wife, strongly opposing Petitioner's release on parole. (Answer Ex. 2, Pet. Ex. 2 at 37-45.) Deputy District Attorney Brown's letter focused on the extent to which

4

Petitioner's actions in the murder and subsequent cover-up were calculated and pre-planned.  The letter detailed that Petitioner murdered his wife on his birthday, telling guests that evening that "his best present was yet to come" and stressed the extreme force Walker used against his wife which knocked out one of her eyes and nearly amputated one of her finger, as well as described the extensive contacts Petitioner had with a woman he had been seeing for several months prior to the murder, to whom he had written numerous letters, and with whom he had visited on the night of his wife's death, and contacted repeatedly thereafter.  (*Id.* at 38-43.)  The letter also detailed Petitioner's conduct in attempting to have the main witness against him, a childhood friend, killed for $200.00.  (*Id.* at 43-44.)  Brown urged the BPH to consider Petitioner as "one who plots and plans without any regard for the law or the rights of other people."  (*Id.* at 44.)  Petitioner's counsel objected to the admission of this letter because she had not been previously provided with a copy, in violation of the "ten-day rule."  (*Id.* at 13.)  However, the Presiding Commissioner read the letter into the record over the objection.  (*Id.*)

The Board then considered Petitioner's post-conviction factors, nearly all of which were notably positive.  (Answer Ex. 2, Pet. Ex. 2 at 45-52.)  BPH considered that Petitioner had earned exceptional to above average work reports, had obtained various degrees and vocational skills while incarcerated, had participated extensively in self-help and therapeutic programs, and had volunteered to teach classes and assist charitable causes.  (*Id.*)  The Presiding Commissioner also read into the record portions of Petitioner's 2005 psychological report:

> Mr. Walker stated that his offense was his fault, rather than his wife's fault.
> He stated that he was the one that handled the pressures inappropriately.
> He wants to make it clear that he does not blame his wife.  His self-
> awareness and insight is good.  His sense of remorse [at] his irresponsible
> behavior is very deep and sincere.
>
> I agree with the previous evaluators that state that he has learned to handle
> interpersonal conflict in a responsible, non-aggressive manner by talking

over the problems and understanding the dynamics.  He has learned to
assert himself in a positive and responsible manner, rather then [*sic*] storing
the hurt and pain inside and keeping his mouth shout [*sic*] in quiet
subservience.

He often, during the interview, spoke at length about how badly he has
damaged his wife's family, as well as his own children.  He stated that his
wife's death left a void in the family that could never be corrected or
replaced.

Regarding his violence potential, in a controlled [setting] of the institution
it is significantly below average in comparison to other inmates.  He
demonstrates maturity, self-control and positive influence on others.  He
has remained disciplinary free, which is a commendable achievement.

His violence potential, if released on parole at this point in time, is no
greater then [*sic*] the average citizen in the community. . . . [H]e does not
have any antisocial values.  He has never been violent in the community
before the commitment offense.  He has never been violent in the
institution after the commitment offense.  The commitment offense was
[highly] situational.  He continues to have a strong family support, and he
also has valid job offers.  He has excellent skills as a master mechanic.

All [of these factors] indicate that he will make a strong, positive
adjustment to society.  There are not significant risk factors that would be
precursors to violence . . . .

Inmate Walker has participated in extensive therapy and self-help groups
over the years.  I agree with previous evaluators who state that there is no
further need for participation in therapy endeavors.  There is no need for
future psychological evaluations.  His prognosis for successful adjustment
in the community, in this case, is excellent.  He does not have a drug or
alcohol problem and there is no need to participate in testing or self-help
groups on parole.

(*Id.* at 54-56; *see* Pet. Ex. 11 for full report.)

After a recess to consider the evidence, the BPH found that Petitioner was "not

suitable for parole and would pose an unreasonable risk of danger to society, or a threat

to public safety, if release[d] from prison.  (Answer Ex. 2, Pet. Ex. 2 at 61.)  This

determination was based primarily on Petitioner's commitment offense and his

minimizing his role in certain aspects of the offense, and the Presiding Commissioner

restated the underlying facts as follows:

On June 6, 1981, Inmate Walker brutally bludgeoned his wife of fourteen
years about the head with a one and a half pound fishing weight.  This
resulted in the victim falling into a coma and dying several days later.

6

> Walker planned his wife's murder several days before the actual event and arranged for the assistance of a friend, Tommy Olsen to make a killing look like the victim surprised a burglar. He conspired to have his friend physically attack him in order to divert suspicion from himself. He then called [p]olice and an ambulance to take his wife to the hospital. He later solicited Santa Rita County Jail inmate, Charles Bell, to kill the friend, his long-time friend Tommy Olsen in an attempt to silence a potential witness against him.

(*Id.* at 61-62.)

The Board found that "[t]he offense was carried out in an especially cruel and callous manner" and gave several reasons to justify this determination. (Answer Ex. 2, Pet. Ex. 2 at 62.) First, the Board found that the offense was "premeditated, calculated, certainly dispassionate and demonstrat[ing] an exceptional[ly] callous disregard for human suffering." (*Id.*) The Presiding Commissioner explained:

> After he bludgeoned his wife in her bed, he cleaned himself up and set the stage for the burglary. Then [he] made the appropriate phone calls after the fact, while she lay there dying. He was more concerned about himself clearly, then [*sic*] he was about his wife, no matter what he says.

(*Id.*) Second, the Presiding Commissioner found that "[t]he motive for the crime [was] inexplicable and very trivial in relationship to this offense" and explained:

> Obviously a divorce, separation or some non-violent way to handle this situation - obviously he wasn't getting along. Maybe she was mad at him for things as well. But, we think there are several factors here that may have been the motive. One would be simple and clear, money. Child support is expensive, alimony. He says that he would loose [*sic*] the children. Well, generally speaking, the kids go with mom but there's court[s] that allow[] father as long as there's no abuse - father to visit the children and take them on summer trips and do all kinds of things in a civil manner. Yes, it's not the best situation for the kids, but neither is losing their mother in such a brutal crime.

(*Id.* at 62-63.) The Presiding Commissioner further noted that Petitioner appears to have minimized that his involvement with another woman, as well as his role in soliciting the murder of one of the witnesses against him. (*Id.* at 63-64.)

The Presiding Commissioner acknowledged that Petitioner's previous record, institutional behavior, participation in self-help, parole plans and psychological report were outstanding. (Answer Ex. 2, Pet. Ex. 2 at 64-69.) Still, the Board denied parole for

two years, stating that "the commitment offense is so, so overwhelming that [the least] we could give you was two years." (*Id.* at 69.)  The Presiding Commissioner opined that Petitioner was "probably very lucky to be here today and not [] up at San Quentin sitting on death row." (*Id.* at 64.)  The Presiding Commissioner noted that although the crime can never change, "the distance does." (*Id.* at 70.)

Petitioner challenged the Board's decision in Alameda County Superior Court, which denied his claims in a reasoned opinion on March 1, 2006.  (Answer Ex. 6, Pet. Ex. 8.)  The California Court of Appeal for the Second Appellate District and the California Supreme Court summarily denied Petitioner's habeas petition on April 13, 2006 and June 28, 2006, respectively.  (Answer Ex. 8 & 10.)  Thereafter, Petitioner filed the instant federal petition for a writ of habeas corpus on August 22, 2006.

## DISCUSSION

A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

8

proceeding."  28 U.S.C. § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See, e.g., Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).  If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts.  *See Lockhart*, 250 F.3d at 1232.

B.    Legal Claims and Analysis

Petitioner claims that his due process and equal protection rights under the Fifth and Fourteenth Amendments were violated by BPH's denial of parole solely on the basis

9

of his commitment offense because the offense had occurred twenty-four years earlier and no longer provided reliable evidence of his dangerousness.  Petitioner also claims that his due process and equal protection rights were violated by the BPH's consideration of an untimely letter submitted by the Deputy District Attorney, in violation of California Penal Code section 3041.5(a)(1), and by BPH's failure to properly consider evidence that Petitioner had experienced intimate partner battering, in violation of California Penal Code section 4801(b).

      1.      <u>The Federal Right to Due Process in California Parole Hearings</u>

California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).  In making this determination, BPH considers such factors as the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime.  *See* Cal. Code Regs. tit. 15, § 2402(b) – (d).

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006) (*quoting McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002)).  The determination does not depend on whether a parole release date has ever been set for the prisoner because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding the prisoner unsuitable for parole.  *Sass*, 461 F.3d at 1128 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*,

472 U.S. 445, 454-55 (1985), applies to parole decisions in a section 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same). The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the parole board] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455 (quoted in *Sass*, 461 F.3d at 1128).

Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904. Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the parole board. *See Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1399 (9th Cir. 1987). In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007). Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole. *Id.*

The recent California Supreme Court case of *In re Lawrence*, 44 Cal.4th 1181 (2008), clarified what California law requires the parole board to find in order to deny parole: The board must find only that the prisoner is a current threat to public safety, not that some of the specific factors in the regulations have or have not been established. *Id.*

at 1212.  This means that the "some evidence" test is whether there is "some evidence" that the prisoner is a threat, not whether there is "some evidence" to support particular secondary findings of the parole board, for instance that the prisoner needs more time for rehabilitation.  *Id.*; *see Irons*, 505 F.3d at 851 (when assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state).

California law also clearly states that "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole."  *In re Rosenkrantz*, 29 Cal. 4th 616, 682 (2002).  However, "the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released."  *Irons*, 505 F.3d at 852 (citing *In re Dannenberg*, 34 Cal. 4th 1061, 1071 (2005)).  The circumstances must show that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner," and the factors to be considered include:

> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

Cal. Code Regs. tit. 15, § 2402(c)(1).  But overall, the "circumstances of the crime reliably established by evidence in the record" must "rationally indicate that the offender will present an unreasonable public safety risk if released from prison" to justify a denial

1   of parole on the basis of the commitment offense.  *In re Scott*, 133 Cal. App. 4th 573,

2   595 (2005).

3          While "the parole board's sole supportable reliance on the gravity of the offense

4   and conduct prior to imprisonment to justify denial of parole can be initially justified,"

5   over time, "should [a prisoner] continue to demonstrate exemplary behavior and

6   evidence of rehabilitation, denying him a parole date simply because of the nature of

7   [his] offense and prior conduct would raise serious questions involving his liberty

8   interest in parole." *Biggs*, 334 F.3d at 916.  "A continued reliance . . . on an unchanging

9   factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary

10  to the rehabilitative goals espoused by the prison system and could result in a due

11  process violation." *Id.* at 917.

12          2.      The State Superior Court Decision

13         The Alameda County Superior Court denied Petitioner's habeas petition, based on

14  the same claims as the instant petition, in a reasoned opinion on March 1, 2006.  (Answer

15  Ex. 6, Pet. Ex. 8.)  The court held that BPH's sole reliance on Petitioner's commitment

16  offense to deny parole was not arbitrary, capricious or unreasonable because there was

17  some evidence in the record to support its determination that the especially cruel and

18  callous nature of Petitioner's crime indicated that he would pose an unreasonable risk of

19  danger to society.  (*Id.* at 1-3.)  In particular, the court stated that there was some

20  evidence in support of BPH's primary factor, that the offense "was committed with an

21  exceptionally callous disregard for human suffering."  (*Id.* at 2-3.)  The court also found

22  that BPH had "relied upon facts beyond the minimum elements of first degree murder."

23  (*Id.* at 3.)

24          The Superior Court also found that BPH had considered "various documentation

25  that discussed evidence that Petitioner was a battered spouse," even though BPH "did not

26  state on the record the information or evidence that it considered pursuant to Penal Code

27

28
                                        13

4801(b)." (Answer Ex. 6, Pet. Ex. 8 at 3.)  The court held that "[b]ecause the record reflects that the information was considered, but the Board relied solely upon the commitment offense, the failure to comply with Penal Code section 4801(b) was harmless." (*Id.*)  Finally, the court noted that BPH had "refer[red] to the prosecuting attorney's letter as required by Penal Code section 3046(c)," and stated that "[a]ssuming that the letter by the prosecuting attorney was untimely, there is no evidence that Petitioner was unable to respond to the letter at the hearing." (*Id.*)  The court noted that "Petitioner claims that [] Commissioner Sawyer prevented him from responding to the letter, although Petitioner admits that such evidence is not reflected in the transcript," and found that because the hearing transcript "has a declaration and certification by the transcriber that the 70 pages of transcript constitute a true, complete, and accurate transcription of the parole hearing[,]" Petitioner had failed to support this claim. (*Id.* at 3-4.)

Because the Superior Court is the highest state court to address the merits of Petitioner's claim in a reasoned opinion, this Court looks to its decision to decide whether it was contrary to, or involving an unreasonable application of, clearly established federal law. *See LaJoie*, 217 F.3d at 669 n.7.

### 3. Denial of Parole Based on Petitioner's Commitment Offense

Petitioner claims that BPH's denial of parole solely on the basis of his commitment offense, after twenty-four years and in spite of many positive factors indicating suitability for parole, was a violation of due process.  Because BPH had some evidence to support its findings that Petitioner's commitment offense was especially cruel and was indicative of his current dangerousness, and because there is no clearly established federal law holding that parole denial on the basis of the commitment offense can violate due process for a prisoner who has not yet served the minimum term of his life sentence, Petitioner's claim must fail.

1    Based on the facts of Petitioner's crime as established by the California Court of

2    Appeal, and based on Petitioner's own admissions, the BPH had some evidence to

3    support its findings that Petitioner's murder of his wife was "calculated," "dispassionate"

4    and "demonstrat[ing] an exceptional[ly] callous disregard for human suffering" and that

5    the motive for the crime was "inexplicable and very trivial in relationship to this

6    offense." (Answer Ex. 2, Pet. Ex. 2 at 62.)  Petitioner meticulously planned the murder

7    for weeks in advance, inventing an elaborate scheme to avoid getting caught.  (*Id.* at 17.)

8    Petitioner was convicted of soliciting the murder of the only witness to his crime a

9    significant period of time after killing his wife.  (*Id.* at 16-17.)  These facts provide some

10   evidence that Petitioner's crime was especially "calculated" and "dispassionate" beyond

11   the minimum elements of first degree murder.  Additionally, Petitioner admitted to

12   bludgeoning his wife on the head and neck ten to twelve times, striking the back of her

13   neck with his hand, knowing that his wife was still alive, but covering up the crime

14   instead of calling for help.  (*Id.* at 19.)  Petitioner's crime resulted in his wife sustaining

15   "massive head injuries," entering a coma and dying eight days later.  (*Id.* at 15-16.)

16   Petitioner's choice of this brutal method of killing and then using precious time in

17   covering up the crime provides some evidence of "an exceptional[ly] callous disregard

18   for human suffering" beyond the minimum elements of first degree murder.

19   For the same reasons, the circumstances of Petitioner's crime provide some

20   evidence which "rationally indicate[s] that [he] will present an unreasonable public

21   safety risk if released from prison."  *Scott*, 133 Cal. App. 4th at 595.  It was not irrational

22   for the BPH to conclude that a prisoner who had gone to such great lengths to plan, carry

23   out and escape punishment for an especially brutal murder continues to pose an

24   unreasonable risk to society.

25   Of course, it cannot be denied that BPH also had before it abundant evidence that

26   Petitioner has been a model prisoner.  In particular, his psychological report described

27

28
                                         15

the crime as "highly situational" and described his "prognosis for successful adjustment in the community" as "excellent." (Pet. Ex. 11 at 6.)

But the question before this Court is not whether BPH properly weighed the evidence before it; the question is whether there was "some evidence" to support the BPH's denial of parole. *Sass*, 461 F.3d at 1128. It is not up to this Court to "reweigh the evidence." *Powell v. Gomez*, 33 F.3d 39, 42 (9th Cir. 1994).

The Ninth Circuit has cautioned that "continued reliance . . . on an unchanging factor" to deny parole, such as a prisoner's commitment offense, "could result in a due process violation." *Biggs*, 334 F.3d at 917. But there is no clearly established federal law holding that such reliance may violate due process for a prisoner who, like Petitioner, has not yet served the minimum term of his sentence. In *Irons*, the Ninth Circuit noted that "in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." *Irons*, 505 F.3d at 853 (upholding parole denial for a prisoner who had served sixteen years on his seventeen years to life sentence); *see Biggs*, 334 F.3d at 912 (upholding parole denial for a prisoner who had served fifteen years on his twenty-five years to life sentence); *Sass*, 461 F.3d at 1125 (upholding parole denial for a prisoner who had served thirteen years on his fifteen years to life sentence). While the exact point at which reliance on an unchanging factor becomes a due process violation has yet to be defined, Ninth Circuit precedent suggests that this point has not yet arrived for Petitioner.

Because BPH's denial of parole was supported by some evidence, the Alameda County Superior Court decision upholding the BPH's parole denial was not contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 411; 28 U.S.C. § 2254(d). Therefore, habeas relief is not warranted on this claim.

1

4.      The Admission of the Deputy District Attorney's Letter

2      California Penal Code section 3041.5(a)(1) states that, at all hearings for the

3  purpose of reviewing a prisoner's parole suitability, "[a]t least 10 days prior to any

4  hearing by the Board of Parole Hearings, the prisoner shall be permitted to review his or

5  her file which will be examined by the board and shall have the opportunity to enter a

6  written response to any material contained in the file."  Petitioner claims that by reading

7  into the record a letter of opposition from the Deputy District Attorney that neither

8  Petitioner nor his attorney had seen before the day of the parole hearing, the BPH

9  violated section 3041.5(a)(1).

10      Regardless of whether BPH's consideration of the Deputy District Attorney's

11  letter was an error under California law, in this case it cannot serve as the basis of federal

12  habeas relief.  As discussed above, BPH's denial of parole does not violate due process

13  unless there is no reliable evidence in the record which could support its finding that a

14  prisoner presents an unreasonable risk to society.  The Deputy District Attorney's letter

15  made additional factual allegations about Petitioner's crime that were unfavorable to him

16  and made various arguments emphasizing Petitioner's culpability and dangerousness.

17  (Answer Ex. 2, Pet. Ex. 2 at 37-45.)  But in justifying the denial of parole, neither the

18  BPH nor the Alameda County Superior Court relied on any facts alleged by the Deputy

19  District Attorney that were not supported elsewhere in the record.  Although BPH noted

20  that there was a "very clear and very succinct letter in opposition of [Petitioner's] release

21  from the District Attorney's office in Alameda County," this opposition in itself was not

22  a reason for denial of parole.  Both the Board and the Superior Court relied solely on

23  Petitioner's commitment offense to justify parole denial.  As discussed above, the facts

24  of the commitment offense as established by the California Court of Appeal on

25  Petitioner's direct appeal of his conviction and by Petitioner's own admission provide

26  sufficient evidence to deny parole without any consideration of the Deputy District

27

28

17

1   Attorney's allegations.  Even if the BPH erred in admitting the Deputy District

2   Attorney's letter, this error still does not undercut the reliability of the evidence used to

3   deny parole, and therefore does not violate due process.  *See Rosas*, 428 F.3d at 1232;

4   *Biggs*, 334 F.3d at 915.  For these reasons, habeas relief is not warranted on this claim.

5           5.      The Failure to Consider Evidence of Intimate Partner Battering

6   California Penal Code section 4801(b) states:

7       The Board of Prison Terms [now called Board of Parole Hearings], in
        reviewing a prisoner's suitability for parole . . . shall consider any

8       information or evidence that, at the time of the commission of the crime,
        the prisoner had experienced intimate partner battering, but was convicted

9       of the offense prior to enactment of Section 1107 of the Evidence Code by
        Chapter 812 of the Statutes of 1991.  The board shall state on the record the

10      information or evidence that it considered pursuant to this subdivision, and
        the reasons for the parole decision.

11

12  Petitioner claims that BPH improperly failed to consider such evidence in violation of

13  section 4801(b), but the record contradicts this claim.  The Presiding Commissioner read

14  into the record excerpts of the 1983 California Court of Appeal opinion concerning

15  Petitioner's direct appeal of his conviction, including a summary of Petitioner's

16  testimony about his wife's controlling and oppressive behavior toward him.  (Answer Ex.

17  2, Pet. Ex. 2 at 18.)  The BPH also considered that no fewer than ten witnesses at

18  Petitioner's trial had given testimony establishing that he was an "emotionally battered

19  husband" and that he had felt that murder was "his only option . . . to end the repressive

20  situation he found himself in."  (*Id.*)  While state law requires that BPH "consider" such

21  mitigating evidence in determining parole suitability, in no way does it demand that such

22  evidence be given more weight than circumstances showing that the crime was

23  thoroughly premeditated and calculated and was carried out in a particularly brutal

24  manner.  Petitioner has not established that any purported error of state law has violated

25  his due process rights.  As discussed above, the BPH had "some evidence" to support its

26  determination that the prisoner was unsuitable for parole.  *Sass*, 461 F.3d at 1128.  This

27  Court cannot "reweigh the evidence,"*Powell*, 33 F.3d at 42, to determine that the

28                                              18

mitigating evidence of spousal abuse should be accorded a greater weight than that given to it by the BPH.

     6.    Equal Protection Claims

    Petitioner also argues that the BPH's failure to preclude the admission of Deputy District Attorney Brown's letter and to consider evidence of Intimate Partner Battering Syndrome violated his equal protection rights.  However, both such claims fail.

    "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different treatment of unlike groups does not support an equal protection claim).  The Equal Protection Clause of the Fourteenth Amendment does not assure uniformity of judicial decisions or immunity from judicial error; otherwise, every alleged misapplication of state law would constitute a federal constitutional question. *See Alford v. Rolfs*, 867 F.2d 1216, 1219 (9th Cir. 1989) (citing *Beck v. Washington*, 369 U.S. 541, 554-55 (1962)); *see, e.g., Little v. Crawford*, 449 F.3d 1075, 1083 (9th Cir. 2006) (petitioner cannot establish equal protection claim warranting habeas relief simply because, or if, the Nevada Supreme Court misapplied Nevada law or departed from its past precedents).

    Here, Petitioner submits transcripts of three BPH hearings from hearings held with regard to other inmates, where letters from law enforcement personnel were precluded due to violations of the 10 day rule.  However, the mere fact that the BPH may have admitted the letter in violation of state law does not establish an equal protection violation.  *See Little*, 449 F.3d at 1086.  Moreover, Petitioner provides no support for his assertion that the Board failed to consider evidence that he suffered from spousal

1    battering because he is a man.  Therefore, habeas relief is unwarranted on his claims of

2    an equal protection violation.

3                                     **CONCLUSION**

4         For the reasons set forth above, the petition for a writ of habeas corpus is DENIED.

5    The Clerk shall enter judgment in favor of Respondent and close the file.

6         IT IS SO ORDERED.

7    DATED: August 12, 2009

8                                 JEFFREY S. WHITE
                                  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                          UNITED STATES DISTRICT COURT

28                               FOR THE

1     NORTHERN DISTRICT OF CALIFORNIA

2

3

4     JEFFERSON D WALKER,                    Case Number: CV06-05050 JSW

5              Plaintiff,                    **CERTIFICATE OF SERVICE**

6        v.

7     B CURRY, WARDEN et al,

8              Defendant.
      _____/

9

10    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
      Court, Northern District of California.

11    That on August 12, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
      copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
12    said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery
      receptacle located in the Clerk's office.

13

14    Jefferson D. Walker
      C49778
15    CTF East Dorm (ED-67U)
      Soledad,  CA 93960

16

17    Dated: August 12, 2009

                                            *Jennifer Ottolini*

18                                          Richard W. Wieking, Clerk
                                            By: Jennifer Ottolini, Deputy Clerk

19

20

21

22

23

24

25

26

27

28